UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CLEARLAKE SHIPPING PTE, LTD.,

Plaintiff,

v.

O.W. BUNKER (SWITZERLAND) SA,
O.W. BUNKER USA INC., OW BUNKER
NORTH AMERICA INC., OW BUNKER
HOLDING NORTH AMERICA INC.,
NUSTAR ENERGY SERVICES, INC., ING
BANK N.V.

Defendants.

14 CV 9287 (VEC)

**ORAL ARGUMENT REQUESTED**

### NUSTAR ENERGY SERVICES, INC.'S MEMORANDUM OF LAW
### IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**Blank Rome LLP**
Thomas H. Belknap, Jr.
The Chrysler Building
400 Lexington Avenue
New York, New York 10174-0208
*tbelknap@blankrome.com*

Keith B. Letourneau
717 Texas Avenue, Suite 1400
Houston, TX 77002
*kletourneau@blankrome.com*

*Attorneys for Defendant*
*Nustar Energy Services, Inc.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

FACTS ...............................................................................................................................3

      A.    October 14-26, 2014: Clearlake Orders Bunkers for, and NuStar
          Delivers Bunkers to, OCEAN GLORY and HELLAS GLORY .................3

      B.    November 27, 2014: Clearlake Files For Interpleader..................................6

ARGUMENT .......................................................................................................................7

    1.    Standard of Review..................................................................................................7

    2.    The Commercial Instruments and Maritime Liens Act Controls..............................7

      A.    *Ken Lucky* compels a finding that NuStar supplied the Fuel to the
          vessel "on the order of the owner or a person authorized by the
          owner."...............................................................................................................9

      B.    *Lake Charles Stevedores* does not preclude NuStar's maritime lien
          claim..................................................................................................................14

      C.    Two recent OW-related District Court opinions should not be
          applied by this Court to deny NuStar's maritime lien claim. ....................17

    3.    Public Policy Strongly Favors Awarding an American Materialman a
        Maritime Lien for Necessaries Supplied to a Foreign-Flag Vessel in an
        American Port .......................................................................................................19

    4.    Equity and Good Conscience Support an Award in NuStar's Favor.....................21

    5.    ING Bank's Security Agreement Does Not Afford it a Maritime Lien.................23

CONCLUSION...................................................................................................................25

141535.06502/102259050v.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)......................................................................................................7

*Atlantic & Gulf Stevedore, Inc. v. M/V Grand Loyalty,*
608 F.2d 197 (5th Cir. 1979) ....................................................................................12, 16

*Atlantic & Gulf Stevedores, Inc. v. M/V Grand Loyalty,*
608 F.2d 197 (1979).....................................................................................................20

*Belcher Oil Co. v. M/V Gardenia,*
766 F.2d 1508 (11th Cir. 1985) ...................................................................................9

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986).......................................................................................................7

*Crescent City Marine, Inc. v. M.V. Nunki,*
20 F.3d 665 (5th Cir. 1994) .........................................................................................14

*Custom Fuel Services, Inc. v. Lombas Industries, Inc.,*
805 F. 2d 561 (5th Cir. 1986) ......................................................................................21

*Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co.,*
310 U.S. 268 (1940).......................................................................................................8

*The Eastern,* 275 Fed. 874 (D. Mass. 1919) ...............................................................12

*Farwest Steel Corp. v. Barge Sea-Span,*
828 F.2d 522 (9th Cir. 1987) ...............................................................................10, 11, 12

*Galehead, Inc. v. M/V ANGLIA,*
183 F.3d 1241 (11th Cir. 1999) ...................................................................................15

*Galehead, Inc. v. M/V GOODPAL,*
No. C98-0148, 1999 WL 1488986 (W.D. Wash. Jan. 20, 1999)...........................................16

*Great Lakes Business Trust v. M/T Orange Sun,*
855 F. Supp. 2d 131 (S.D.N.Y. 2012)............................................................................21

*Gulf Trading & Transportation Co. v. The Vessel Hoegh Shield,*
658 F.2d 363 (5th Cir. 1981), *cert. denied,* 457 U.S. 1119, 102 S.Ct. 2932, 73
L.Ed.2d 1332 (1982), 805 F.2d 42 (1st Cir. 1986) ..............................................................19

ii

*In re Parmalat Sec. Litig.*,
    477 F. Supp. 2d 602, 609 (S.D.N.Y. 2007)...............................................................................9

*In re Wedtech Sec. Litig.*,
    138 B.R. 5, 9 (S.D.N.Y. 1992)................................................................................................9

*Jan C. Uiterwyk Co. v. MV Mare Arabico*,
    459 F. Supp. 1325 (D. Md. 1978)..........................................................................................16

*L&L Oil Company v. M/V Rebel*,
    96 F.3d 1445 (5th Cir. 1996) ...........................................................................................11, 12

*Lake Charles Stevedores, Inc. v. Professor Vladimir Popov M/V*,
    199 F.3d 220 (5th Cir. 1999) ..................................................................................... *passim*

*Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky*,
    869 F.2d 473 (9th Cir. 1988) ..................................................................................... *passim*

*Miami Purchasing Serv. Corp. v. Comm'r of Internal Revenue*,
    76 T.C. 818 (1981)..................................................................................................................14

*Reinholm Crane & Rigging Co. v. M/V Ocean Crown*,
    484 F. Supp. 935 (W.D. Wash. 1979)....................................................................................16

*Tramp Oil and Marine, Ltd. v. M/V Mermaid I*,
    805 F.2d 42 (1st Cir. 1986) .............................................................................................12, 19

*Trico Marine Operators, Inc. v. Falcon Drilling Co.*,
    1997 A.M.C. 267 (E.D. La. 1996) ........................................................................................12

*Trinidad Foundry and Fabricating, Ltd. v. M/V K.A.S. Camilla*,
    966 F.2d 613 (11th Cir. 1992) ........................................................................................24, 25

*Triton Marine Fuels Ltd., S.A. v. M/V PACIFIC CHUKOTKA*,
    575 F.3d 409 (4th Cir. 2009) .................................................................................................23

*Vaughn v. Atkinson*,
    369 U.S. 527 (1962)...............................................................................................................21

*Ventura Packers, Inc. v. FV Jeanine Kathleen*,
    305 F.3d 913 (9th Cir. 2002) ...................................................................................................8

*Vestoil, Ltd. v. M/V M PIONEER*,
    No. 6:04CV770-ORL-19DAB, 2005 WL 3675960 (M.D. Fla. Mar. 31, 2005).....................23

*World Fuel Services Singapore Pte. Ltd. v. Bulk Julianna MV*,
    No. 15-30239, 2016 WL 1295041 (5th Cir. Apr. 1, 2016).....................................................13

iii

**Statutes**

28 U.S.C. § 1335 ..................................................................................................................6

46 U.S.C. § 31341 ...............................................................................................................2

46 U.S.C. § 31341(a)(4) *et seq.* .......................................................................................9

46 U.S.C. § 31342 ............................................................................................................7, 8

46 U.S.C. § 31342(a)(1) ......................................................................................................8

CIMLA § 31341(a)(4) ........................................................................................................12

**Other Authorities**

Fed. R. Civ. P. 56(a) ...........................................................................................................7

Fed. R. Civ. P. 56(e) ...........................................................................................................7

141535.06502/102259050v.1

Defendant-Claimant NuStar Energy Services, Inc. ("NuStar") respectfully files this Memorandum of Law in support of its Motion for Summary Judgment in the above-captioned matter involving the vessels VENUS GLORY and HELLAS GLORY (collectively "Vessels") and submits it is entitled to summary judgment because:

- NuStar physically supplied bunkers (fuel) to the Vessels in fulfillment of orders that originated with Clearlake, the vessel's charterer, for a total amount of $1,208,032.76;

- NuStar has not received payment for the bunkers it supplied to the Vessels;

- As a physical supplier of necessaries (bunker fuel) that were supplied on the order of the Vessels' charterer, NuStar possesses a statutory maritime lien against the Vessels regardless of whether an OW entity meets agent status or the lack of direct contractual privity between NuStar and the Vessels' charterer; and,

- Should the Court find that an OW entity also has a valid-lien claim, any award to OW should be limited to OW's expected margin ($100,564.34). Equity should not allow a maritime lien to lie in an intermediary's favor without it paying the actual materialman.

In support of the foregoing, NuStar respectfully presents the following:

## PRELIMINARY STATEMENT

NuStar is an actual supplier of bunker fuel to merchant vessels. The O.W. Bunker Group ("OW") was a worldwide bunker supply company with whom NuStar dealt before OW's financial implosion in November, 2014, leaving some $650 million of debt in its wake. Through its dealings with OW in October and early November 2014 (just prior to OW's meltdown), NuStar provided over 36,346 metric tons[1] of bunker fuel at a cost exceeding $18.0 million to more than thirty vessels in Texas (and one abroad) in fulfillment of orders that originated with the vessels, their owners or charterers. The OW entities involved, who supplied no fuel, paid for no fuel and only ever expected to receive a modest margin, served as mere intermediaries between the vessel

---

[1] For frame of reference, 36,346 metric tons of fuel would fill approximately <u>seventeen</u> Olympic-sized swimming pools holding 600,000 gallons each.

1

owner/charterer and NuStar. Nevertheless, ING Bank, as OW Bunker (Switzerland) SA's ("OW Switzerland's") purported assignee, seek to recover 100% of the bunker value supplied by NuStar.[2]

Although NuStar's maritime lien claim against the Vessels is the subject of this motion, the basis for awarding NuStar its lien applies to all of NuStar's claims pending before this Court. More particularly, the maritime lien right ensconced in the Commercial Instruments and Maritime Lien Act ("CIMLA"), 46 U.S.C. §§ 31341 *et seq.*, is specifically intended to protect fuel suppliers like NuStar. The lien provides materialmen the security of knowing that, in exchange for taking the financial risk of providing expensive necessaries to vessels on credit, there exists a tangible asset (the vessel) against which the materialmen can foreclose in the event of a purchaser's post-delivery default. NuStar meets the requirements of the only circuit-court case that has addressed the issue on all fours, *Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky*,[3] and also meets criteria addressed in the Fifth Circuit's decision in *Lake Charles Stevedores, Inc. v. Professor Vladimir Popov M/V*[4] where a subcontractor in the general-contractor line of cases has been found to possess a maritime lien.

As expressed in a variety of circuit-court decisions, the Congressional intent behind CIMLA is to protect American materialmen like NuStar, who supply necessaries to foreign vessels in American ports. That protection will be eviscerated if materialmen must prove that either they are in privity of contract with the owner or charterer or that the owner or charter specifically "selected" them before acquiring a maritime lien. No such requirements exist in CIMLA, and no American materialman will ever agree to supply bunker fuel on credit if this standard prevails.

---

[2] ING Bank, the bankrupt intermediary's lending creditor, claims that the intermediary's lien claims were assigned to it and is therefore seeking to recover 100% of the value of bunkers supplied by NuStar, to distribute amongst a syndicate of international lenders, who had no involvement whatsoever in the underlying bunker deliveries at issue.
[3] 869 F. 2d 473 (9th Cir. 1988).
[4] 199 F. 3d 220 (5th Cir. 1999).

Further, principles of equity enforceable by this admiralty court serve as an alternative ground to award NuStar its fuel costs. Additionally, to the extent ING Bank seeks to enforce a maritime lien as assignee, the English Omnibus Security Agreement upon which it relies assigns no such lien.

For these reasons and as addressed in detail below, NuStar respectfully requests that the Court grant its summary judgment motion finding NuStar possesses a maritime liens against the Vessels and award it the sum of $1,208,032.76, plus interest accrued until the date of payment.

## FACTS

### A.   October 14-26, 2014: Clearlake Orders Bunkers for, and NuStar Delivers Bunkers to, OCEAN GLORY and HELLAS GLORY

Plaintiff Clearlake Shipping Pte Ltd ("Clearlake") was at all relevant times the time charterer of both HELLAS GLORY and VENUS GLORY.[5]   Under the applicable charters, Clearlake was obligated to supply and pay for bunkers for the Vessels.[6]   Tarcona AS was the authorized agent for Clearlake for ordering bunkers for both Vessels.[7]

On or about October 14, 2014, Clearlake, through Tarcona, placed an order for bunkers with OW Switzerland for delivery to VENUS GLORY in Houston, Texas, on October 20.[8]   Also on or about October 14, 2014, Clearlake, through Tarcona, placed an order for bunkers with OW

---

[5] *See* NuStar's Rule 56.1 Statement of Undisputed Material Facts (hereinafter "NuStar SOF No. __"), No. 2, citing to Exhibit A, Declaration of Thomas H. Belknap, Jr. (hereinafter "Belknap Ex. __"), Ex.1, Deposition of Albert Saifulin (hereinafter "Saifulin Depo.") Pgs. 14, 26-27; also see Belknap Exs. 2 and 3, Charter Agreements for VENUS GLORY and HELLAS GLORY.

[6] *See* NuStar SOF No. 3, citing to Belknap Ex. 1, Saifulin Depo., Pgs. 41, 47.

[7] *See* NuStar SOF No. 4, Belknap Ex. 1, Saifulin Depo., Pgs. 27, 84.

[8] *See* NuStar SOF No. 5, citing to Dkt. 1, Compl. ¶ 15, and Belknap Ex. 4, OW Switzerland Sales Order Confirmation and transmittal email.

Switzerland for delivery to HELLAS GLORY in Houston, Texas, on October 26.[9]   OW
Switzerland in turn passed the orders to OW USA.[10]  OW USA then passed the orders to NuStar.[11]

On October 15, 2014, Tarcona sent email notifications to the Vessels' Masters, the Vessels'
owners, the Vessels' local port agent[12], and the local inspector authorized by Tarcona to check the
quantity of bunkers delivered to the Vessels[13] confirming that bunkers were to be delivered by
NuStar in Houston on October 19, 2014, for VENUS GLORY[14], and on October 22, 2014, for
HELLAS GLORY.[15]  Moreover, the evidence in this case establishes the following:

- Based on previous bunker orders it had placed with OW Switzerland, Clearlake's agent,
  Tarcona, knew that NuStar was usually the physical supplier for bunkers to be delivered in
  Houston when the order was placed through OW[16];

- Tarcona knew at least eight days in advance of delivery to HELLAS GLORY that NuStar
  was the designated physical supplier of the bunkers it had ordered[17];

- Tarcona knew at least four days in advance of delivery to VENUS GLORY that NuStar
  was the designated physical supplier of the bunkers it had ordered[18];

- Prior to actual delivery, Tarcona accepted NuStar as the physical supplier of the bunkers it
  had ordered[19]; and,

---

[9] See NuStar SOF No. 6, citing to Dkt. 1, Compl. ¶ 17, and Belknap Ex. 5, OW Switzerland Sales Order Confirmation and transmittal email.

[10] See NuStar SOF 7, citing to Belknap Exs. 6-9, OW Switzerland Purchase Order Confirmations to OW USA and OW USA Purchase Order Confirmations to OW USA for the Vessels.

[11] See NuStar SOF 8, citing to Belknap Exs. 10-13, OW USA Purchase Order Confirmations to NuStar and NuStar Sales Agreements for the Vessels.  NuStar is a supplier of fuel, including bunkers for ocean-going vessels, and is a Delaware corporation with its principal office in San Antonio, Texas. See NuStar SOF 1, citing to Dkt. No. 20, NuStar Verified Claim, ¶ 6, and Belknap Ex. 24, Deposition of NuStar FRCP 30(b)(6) Representative Paul Davis (hereinafter "Davis Depo.") Pgs. 8, 15-16, 18-19.

[12] The local agent was LBH. See NuStar SOF footnote 1, citing to Belknap Ex. 1, Saifulin Depo., Pgs. 18-21.

[13] The inspection company was SGS. See NuStar SOF footnote 2, citing to Belknap Ex. 1, Saifulin Depo., Pg. 21.

[14] See NuStar SOF No. 5, citing to Dkt. 1, Compl. ¶ 15, and Belknap Ex. 4, OW Switzerland Sales Order Confirmation and transmittal email.

[15] See NuStar SOF 9, citing to Belknap Ex. 1, Saifulin Depo., p. 73-77, and Belknap Exs. 14-17, Tarcona email correspondence to Vessels, Owners, Local Agent, and SGS regarding deliveries of bunkers to Vessels.

[16] See NuStar SOF 10, citing to Belknap Ex. 1, Saifulin Depo., p. 79.

[17] See NuStar SOF 11, citing to Belknap Ex. 1, Saifulin Depo., pgs. 48-49.

[18] See NuStar SOF 12, citing to Belknap Ex. 12, Saifulin Depo., p. 51.

[19] See NuStar SOF 13, citing to Belknap Ex. 13, Saifulin Depo., pgs. 75 and 77.

4

- The Vessels' designated local agent in Houston coordinated the delivery of the bunkers to the Vessels and knew in advance of delivery that NuStar was the designated physical supplier.[20]

NuStar delivered the bunkers at issue to VENUS GLORY on October 20, 2014, and to

HELLAS GLORY on October 26, 2014.[21] The Vessels' Chief Engineers signed and stamped with

the Vessels' seals a "Marine Fuel Delivery Note" confirming the delivery ("NuStar Delivery

Notes").[22] The NuStar Delivery Notes provided on their face as follows:

> [N]o disclaimer by the purchaser of marine fuels covered by this note will alter or waive: the information contained in this note; the seller's maritime lien against the receiving vessel or the cost of the marine fuels covered by this note; or the receiving vessel's liability for the cost of the marine fuels covered by this note.[23]

On November 5, 2014, NuStar issued invoices totaling $1,208,032.76 for the Fuel it

supplied to the Vessels.[24] On November 11, 2014, after learning of OW's collapse, NuStar sent a

demand for payment of the invoices to Clearlake.[25] To date, NuStar has not received payment

from any party for the Fuel supplied to the Vessels on October 20 and 26, 2014.[26]

At the time it accepted the orders for bunkers at issue in this case, NuStar believed it was

selling bunkers to an authorized agent of the Vessels and their owners, as shown in the following

deposition testimony of Paul Davis of NuStar:

> A. Okay. Well, we always believed that we're selling to someone who is working as the agent of the vessel.
> Q. What is the basis for that belief.
> A. That the requests starts from the vessel, probably the chief engineer for a specific quantity, specification, quality, timing, goes through various entities to a supplier, being us, and then we, you know, complete the circle by bringing the fuel to the vessel

---

[20] *See* NuStar SOF 14, citing to Belknap Ex. 18, deposition of Ryan Laney (hereinafter "Laney Depo.") pgs. 14, 22, 24, 26, and 29, as well as excerpts from Exhibit 2 to Laney Depo.

[21] *See* NuStar SOF 15, citing to Belknap Exs. 19-20, NuStar Marine Fuel Delivery Notes for October 20 and 26, 2014, deliveries to Vessels.

[22] *See* NuStar SOF 16, citing to Belknap Exs. 19-20.

[23] *See* NuStar SOF 17, citing to Belknap Exs. 19-20.

[24] *See* NuStar SOF 18, citing to Belknap Exs. 21-22, NuStar invoices.

[25] *See* NuStar SOF 19, citing to Belknap Ex. 23, correspondence from NuStar to Clearlake.

[26] *See* NuStar SOF 20, citing to Dkt. 20, NuStar's Answer and Verified Claim.

5

141535.06502/102259050v.1

and the chief engineer accepts it. So it always starts with the vessel and ends with the vessel.

Q.  In your belief, all the entities in between are agents?

A.  They're working for the vessel owner in the procurement of fuel.[27]

Finally, as evidenced in NuStar's terms and conditions incorporated in the Sales Agreements NuStar issued prior to delivery and in NuStar's Bunker Delivery Notes[28], NuStar relied on the credit of the Vessels when it agreed to provide them with bunkers.[29]  Moreover, Nustar's Treasurer Chris Russell testified that NuStar relied upon the credit of the vessels in making these transactions.[30]

### B.    November 27, 2014: Clearlake Files For Interpleader

On November 27, 2014, Clearlake filed the present action.[31]  On September 24, 2015, 2014, the Court issued an amended order (the "Interpleader Order") finding that Plaintiff had established the procedural prerequisites of 28 U.S.C. § 1335.[32]  In accordance with the Interpleader Order, Clearlake has deposited $1,389,208.10 into the Court's registry (the "Interpleader Funds"), representing the amount due for the bunkers plus one year's interest at 6%.[33]

NuStar and ING Bank have each filed claims to the Interpleader Funds.[34]  While NuStar asserts a first party maritime-lien claim seeking to recover its unpaid invoices totaling $1,208,032.76,[35] ING Bank asserts its claims by virtue of an alleged assignment of OW Switzerland's rights pursuant to the English-Omnibus-Security Agreement reached with the parent

---

[27] *See* NuStar SOF 21, citing to Belknap Ex. 24, Davis Depo., Pgs. 88-91.

[28] *See* NuStar SOF 22, citing to Belknap Exs. 11 and 13, NuStar Sales Agreements.

[29] *See* NuStar SOF 23, citing to Belknap Ex. 25, NuStar's Terms and Conditions of Marine Fuels.

[30] *See* NuStar SOF 24, citing to Belknap Ex. 26, Deposition of NuStar Representative Chris Russell, Pgs. 90-93.

[31] See Dkt. 1.

[32] Dkt. No. 97.

[33] *See* Cashier's Office Registry Deposit entries on docket dated September 28 and 30, 2015.

[34] Dkt. Nos. 20 and 125.

[35] Dkt. No. 20.  NuStar has also asserted a claim for unjust enrichment against ING under principles of equity. *See* NuStar's claim for unjust enrichment in RIGEL LEADER matter at, Dkt. No. 130, and NuStar's arguments in support thereof, at Dkt, 145, which are fully incorporated into this Motion for Summary Judgment as if repeated verbatim.

OW company on behalf of each of its subsidiaries.[36]  ING Bank is seeking to recover OW Switzerland's outstanding invoices, which total $1,308,597.10, for the same Fuel supplied to the Vessels by NuStar.[37]

## ARGUMENT

### 1.    Standard of Review

Summary judgment is appropriate where "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[38]  The moving party bears the burden of demonstrating the absence of any genuine issue of material fact, and all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.[39] Once the moving party meets this initial burden, however, the non-moving party must go beyond the pleadings and by its own evidence demonstrate that there is a genuine issue of fact for trial.[40]  If the non-moving party fails to make such a showing, then the moving party is "entitled to a judgment as a matter of law."[41]

### 2.    The Commercial Instruments and Maritime Liens Act Controls

CIMLA controls in this matter and provides in relevant part as follows:

(a)    *Except as provided in subsection (b) of this section, a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—*
   *(1)    has a maritime lien on the vessel;*
   *(2)    may bring a civil action in rem to enforce the lien; and*
   *(3)    is not required to allege or prove in the action that credit was given to the vessel.[42]*

---

[36] See Dkt. No. 125, ING Ans., counterclaim and crossclaim at ¶ 9.

[37] *See* NuStar SOF 27, citing to Dkt. No. 125, ING Ans., counterclaim and crossclaim at ¶¶ 9-13.

[38] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed.R.Civ.P. 56(a).

[39] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[40] *See Celotex*, 477 U.S. at 323.

[41] *Id.* at 322; Fed. R. Civ. P. 56(e).

[42] 46 U.S.C. §31342.  "Necessaries" are defined in § 31301(4) to include "repairs, supplies, towage, and the use of a dry dock or marine railway."

141535.06502/102259050v.1

Section 31341(a) of CIMLA provides:

*(a)     The following persons are presumed to have authority to procure necessaries for a vessel:*
  *(1)     the owner;*
  *(2)     the master;*
  *(3)     a person entrusted with the management of the vessel at the port of supply; or*
  *(4)     an officer or agent appointed by –*
    *(A)     the owner;*
    *(B)     a charterer;*
    *(C)     an owner pro hac vice;*
    *(D)     an agreed buyer in possession of the vessel.*

The maritime lien conferred by CIMLA is statutory in nature.[43] It depends neither on any contract between the parties, nor on the operation of the general maritime law.[44] Where CIMLA's requirements are satisfied, the necessaries supplier possesses a maritime lien against the vessel to which it supplied the necessaries, and a statutory right of recovery against the vessel irrespective of the contractual relationship between the parties.[45] Thus, the question whether NuStar possesses a maritime lien and *in rem* claim turns entirely on whether the statutory requirements stated in 46 U.S.C. §31342 are satisfied. Here, they are.

For a maritime lien to exist under CIMLA, the claimant must have (a) provided necessaries (b) to a vessel (c) on the order of the owner or a person authorized by the owner.[46] No genuine dispute exists that NuStar supplied necessaries in the form of Fuel to the Vessels. The only issue is whether the Fuel was supplied "*on the order of the owner or a person authorized by the owner*." It was. Consequently, NuStar possesses a maritime lien against the Interpleader Funds.

---

[43] 46 U.S.C. § 31342(a)(1); *Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co.*, 310 U.S. 268 (1940).

[44] *See Ventura Packers, Inc. v. FV Jeanine Kathleen*, 305 F.3d 913, 920 (9th Cir. 2002).

[45] *Id.*

[46] *Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky*, 869 F.2d 473, 476 (9th Cir. 1988); *Lake Charles Stevedores vs Professor Vladimir Popov M/V*, 199 F. 3d 220, 228-229 (5th Cir. 1999) (setting forth various scenarios when subcontractors in the general contractor line of cases have been held to hold maritime liens though not in privity of contract with the Vessel's owner or charterer, one of which is when, as here, the owner or charterer knew the identity of and accepted the subcontractor prior to performance).

A. ***Ken Lucky*** **compels a finding that NuStar supplied the Fuel to the vessel "on the order of the owner or a person authorized by the owner."**

NuStar was the actual fuel supplier, who performed the services requested by Clearlake, the Vessels' charterer.[47] Specifically, on October 14, 2014, Clearlake ordered the bunkers at issue for the Vessels.[48] NuStar delivered those bunkers to VENUS GLORY on October 20, 2014, and to HELLAS GLORY on October 26, 2014.[49] The evidence in this case establishes the following:

- Based on previous bunker orders it had placed with OW Switzerland, Clearlake's agent, Tarcona, and thus Clearlake, knew that NuStar was usually the physical supplier for bunkers to be delivered in Houston when the order was placed through OW;[50]

- Tarcona/Clearlake knew at least eight days in advance of delivery to the HELLAS GLORY that NuStar was the designated physical supplier of the bunkers it had ordered;[51]

- Tarcona/Clearlake knew at least four days in advance of delivery to the VENUS GLORY that NuStar was the designated physical supplier of the bunkers it had ordered;[52]

- Prior to actual delivery, Tarcona/Clearlake accepted NuStar as the physical supplier of the bunkers it had ordered;[53] and,

- The Vessels' designated local agent in Houston coordinated the Fuel deliveries to the Vessels and knew in advance of delivery that NuStar would be physical supplier.[54]

---

[47] A charterer of a vessel is presumed to have the authority to procure necessaries for a vessel. 46 U.S.C.31341(a)(4)(b); *and, Marine Fuel Supply and Towing, Inc. v. M/V Ken Lucky*, 869 F.2d at 476 (9th Cir.1988); *Belcher Oil Co. v. M/V Gardenia*, 766 F.2d 1508, 1512 (11th Cir.1985).

[48] *See* NuStar SOF Nos. 5-6.

[49] *See* NuStar SOF 15.

[50] *See* NuStar SOF 10. Because Tarcona was Clearlake's agent and was acting within the scope of its agency at all relevant times, Tarcona's actions and knowledge were imputed to Clearlake. *See In re Wedtech Sec. Litig.*, 138 B.R. 5, 9 (S.D.N.Y. 1992) ("It is a general principle of agency law that the acts and knowledge of an agent acting within the scope of his agency are imputed to the principal."); *and, In re Parmalat Sec. Litig.*, 477 F. Supp. 2d 602, 609 (S.D.N.Y. 2007)("Under New York law, '[t]he general rule is that knowledge acquired by an agent acting within the scope of his agency is imputed to his principal.'").

[51] *See* NuStar SOF 11.

[52] *See* NuStar SOF 12.

[53] *See* NuStar SOF 13.

[54] *See* NuStar SOF 14.

*Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky*[55] is the only circuit-court case directly on point and clearly establishes that NuStar possesses a maritime lien which may be enforced here. There, the vessel's sub-charterer [Bulkferts], through its managing agent [Eurostem], ordered bunkers for the vessel through an intermediary [Brook]. The intermediary placed the order through Gray Bunkering who, in turn, placed the order with a fuel supplier [Marine Fuel]. The fuel supplier delivered the bunkers and invoiced the intermediary via Gray Bunkering. However, the intermediary subsequently went insolvent and failed to pay, so the fuel supplier arrested the vessel and asserted a maritime lien for providing necessaries. The vessel owner contested the lien on grounds that the intermediary was not the sub-charterer's agent and thus was not "authorized" to procure necessaries for the vessel. The court rejected this argument:

> The parties agree that the order originated from Bulkferts [the subcharterer]. Thus, we need not reach the question whether the district court's conclusion that Brook [the intermediary] was not Bulkfert's agent is erroneous because appellees have already admitted that the fuel and the bunkers were sold *to Bulkferts*. We conclude that Marine Fuel [the fuel supplier] need not establish agency between Brook and Bulkferts to fall within the scope of one entitled to a maritime lien under the Act.[56]

While the court noted that Bulkferts admitted Marine Fuel sold it the bunkers, in fact Marine Fuel's contract was with Brook, the intermediary. When Brook became insolvent, Marine Fuel arrested the vessel on the basis of a maritime lien; it did not seek to enforce a bunker-supply contract with Bulkferts with whom it was not in contractual privity. Thus, the case turned on the order emanating from the sub-charterer, a party with authority to order bunkers, and not on the admission of a sale between Bulkferts and Marine Fuel that never actually occurred.

*Ken Lucky* further held that:

> [Owner] concedes that Bulkferts the sub-charterer] was authorized to bind the vessel. It is clear that Eurostem, as managing agent for Bulkferts, did order the fuel and it is also clear that Marine Fuel [the fuel supplier] delivered the fuel *to the*

---

[55] 869 F.2d 473 (9th Cir. 1988).

[56] *Id.* at 477. (Italics in original; words added).

*vessel*. Section 971 [now § 31342] states that any person furnishing supplies or other necessaries *to a vessel* "upon" the order of a person authorized to bind the vessel shall be entitled to lien. Bulkferts had statutory authority to order the fuel under Section 972 and it did so. Marine Fuel delivered the fuel to the vessel after Bulkferts ordered it. Thus, this case can be easily distinguished from the situation presented in *Farwest II*.[57]

*Ken Lucky*'s analysis boils down to three simple questions: (1) was a necessary at issue; (2) did the entity that ordered the necessary have statutory authority under CIMLA to do so; and (3) was the necessary ultimately provided to the vessel? Answering all three questions in the affirmative, the Court held that the fuel supplier satisfied CIMLA and possessed a maritime lien, despite the absence of an agency relationship between the intermediary and the sub-charterer.

*Ken Lucky* distinguished its holding that the fuel supplier possessed an enforceable maritime lien from an earlier Ninth Circuit ruling in *Farwest Steel Corp. v. Barge Sea-Span*,[58] which held that a "general repair contractor was not endowed with sufficient 'management' authority to support a [necessaries] lien."[59] As the *Ken Lucky* court explained:

> In *Farwest*, the steel was ordered by a contractor repairing the vessel. No one with authority to lien the vessel originated the order. Here Bulkferts, which clearly possessed the statutory authority to bind the vessel, ordered and received the bunkers and fuel. Thus, we are not confronted with a *Farwest* [] situation, where a person who never had authority originated the order.[60]

*L&L Oil Company v. M/V Rebel*[61] also supports the conclusion that NuStar possesses a valid maritime lien claim. In that case, Enjet was the vessel's voyage charterer and in the business of supplying fuel. Vessel interests agreed to buy fuel from Enjet for the voyage. Enjet arranged a

---

[57] *Id.* (Italics in original; words added). *Farwest II* involved the "restrictive repair contract line of cases" in which the court held that a general contractor did not qualify as an "authorized person" to bind the vessel under the earlier version of CIMLA. *Id., citing Farwest Steel Corp. v. Barge Sea-Span*, 828 F.2d 522, 525-26 (9th Cir. 1987).

[58] 828 F.2d 522 (9th Cir. 1987), *cert. denied*, 485 U.S. 1034 (1988).

[59] *Id.* at 526.

[60] 869 F.2d at 477.

[61] 96 F.3d 1445 (5th Cir. 1996).

11

fuel delivery through L&L, who supplied the fuel and invoiced Enjet and the Vessel.[62] Vessel interests paid Enjet, but Enjet went into bankruptcy without paying L&L. L&L thereupon asserted a maritime lien directly against the Vessel.[63]

The Fifth Circuit, affirmed the lower court's finding that L&L possessed a maritime lien, noting that Enjet, a "person to whom the management of the vessel at the port of supply is entrusted," had actual authority to purchase necessaries and to bind the vessel under CIMLA.[64] The court further rejected the vessel interests' assertion that the "restrictive repair contractor" cases – citing, *inter alia, Farwest* – applied, noting that in those cases "the contractor did not have actual authority to bind the vessel, a characteristic that distinguishes *Enjet*."[65] Here, the Fuel order originated with charterer NYK, who was empowered with statutory authority to order necessaries. Thus, we are not dealing with a "restrictive repair contract case."

The fact that each Vessel's Chief Engineer accepted and signed for their respective delivery further bolsters NuStar's lien claim.[66] The law is well established that a chief engineer is a person "entrusted with the management of the vessel" within the meaning of CIMLA § 31341(a)(4).[67] In concluding that a vessel's officer may authorize the provision of necessaries as they are being provided, the *Atlantic & Gulf* court expressly rejected the contention that prior authorization is required: "**Authorization, actual or fairly presumed, given prior to or during rendition of**

---

[62] *Id.*

[63] *Id.*

[64] *Id.*

[65] *Id.*; *see also Tramp Oil and Marine, Ltd. v. M/V Mermaid I,* 805 F.2d 42, 44 (1st Cir. 1986)("No one disputes that Exxon and Colonial, as direct suppliers of the fuel to the Mermaid, would be entitled to a maritime lien.").

[66] *See* NuStar SOF 16.

[67] *See The Eastern,* 275 Fed. 874 (D. Mass. 1919) (Chief engineer ordered fuel and thus incurred a lien); *M/V Ken Lucky,* 869 F.2d 473, 478 (9th Cir. 1988) ("Ken Lucky's chief engineer accepted the bunkers, acknowledged receipt, with the approval of the master. The ship's master also had presumed authority to incur a lien under the Act. The vessel certainly benefitted from the bunker supply."); *accord Atlantic & Gulf Stevedore, Inc. v. M/V Grand Loyalty,* 608 F.2d 197, 200 (5th Cir. 1979) (finding chief officer was a "'person to whom the management of the vessel' is entrusted" with respect to matters within the scope of his duties).

12

**services, or ratified subsequent to rendition will suffice**."[68] Consequently, each Vessel's Chief Engineer authorized the Fuel's delivery or otherwise ratified it when the Fuel was loaded on board.

Here, the orders originated from the Vessels' charterer and NuStar supplied the bunkers ordered. NuStar was not a subcontractor of a separate activity unrelated to Clearlake's Fuel order. A comparison of the transactional progressions involved in *Ken Lucky* and this case show they are essentially identical:

| Ken Lucky | Bulkferts (sub-charterer)/Eurostem Maritime Limited (managing agent) →Brook Oil (intermediary)→ Gray Bunkering → Marine Fuel → Vessel |
|---|---|
| *VENUS GLORY* and *HELLAS GLORY* | Clearlake (charterer)/Tarcona AS (authorized agent) → OW Switzerland (intermediary)→ O.W. Bunker USA (intermediary)→ NuStar → Vessels |

Clearlake, as charterer, was statutorily presumed under CIMLA § 31341(a) to possess the authority to procure necessaries for the vessel, and it was aware of, identified and accepted NuStar as the local supplier prior to delivery of the Fuel. Moreover, NuStar delivered the precise quantity and specification of Fuel ordered by Clearlake in each instance. For the reasons above, NuStar delivered the Fuel to the Vessel "upon the order of" the Vessels' charterer, and possesses a maritime lien under CIMLA.

This conclusion tracks the cases predating OW's collapse that have addressed bunker fuel maritime-lien claims, wherein the physical supplier was either granted a lien or had been paid by intermediaries in the chain.[69] Where the lien was denied, either foreign law applied or the physical

---

[68] *Id.* at 202. (Emphasis added); s*ee also Trico Marine Operators, Inc. v. Falcon Drilling Co.*, 1997 A.M.C. 267 (E.D.La. 1996)(finding contractor's implied authority to incur liens based on obvious benefit to owner and "in light of owners' and operators' acquiescence in the provision of such services necessary to the operation of the manned drilling vessel ....").

[69] See Belknap Decl., Ex. 27, Table of Bunker Fuel Maritime Lien cases.

supplier had knowledge of a no-lien clause.[70]  Otherwise, the actual-fuel suppliers have not been denied liens when they have not been paid.[71]

### B.   *Lake Charles Stevedores* does not preclude NuStar's maritime lien claim.

NuStar expects that ING Bank will rely upon *Lake Charles Stevedores, Inc.*,[72] for the proposition that a materialman does not possess a maritime lien for necessaries ordered by the vessel through an intermediary.  Factually and legally, ING Bank's reliance on *Lake Charles Stevedores* is misplaced.  There, the order for stevedoring services originated not from the owner or its authorized agent, but instead from a third-party rice seller to a subcharterer on FOB terms.[73] Unlike this case, neither the vessel's owner, charterer nor sub-charterer requested, ordered or authorized the seller to procure the stevedoring services in *Lake Charles Stevedores*.  Accordingly, the Fifth Circuit held that a rice supplier that is a party to an FOB contract does not have the authority, "by virtue of that contract, to employ the stevedores on the vessel's account."[74]

By contrast, in *Ken Lucky,* the vessel's sub-charterer, who was authorized by the owner to do so, *specifically ordered* bunker fuel for the vessel.[75]  That order emanated from a person with

---

[70] *Id.*

[71] *Id.*  Recently, the Fifth Circuit granted an intermediary a maritime lien in *World Fuel Services Singapore Pte. Ltd. v. Bulk Julianna MV*, No. 15-30239, 2016 WL 1295041, at *1 (5th Cir. Apr. 1, 2016), for bunker fuel delivered in Singapore.  The intermediary's contract included a U.S. choice of law clause that provided that "[t]he U.S. General Maritime Law of the United States shall apply with respect to the existence of a maritime lien, regardless of the country in which the Seller takes legal action."  *Id.*, at *2.  The court noted that the vessel as a third-party stranger to the contract could be bound by the bunker-supply contract between the intermediary the time charterer, even though the vessel was not a party to that contract.  *Id.* at *6.  The actual fuel supplier was not a party to this suit, and so presumably was paid for the bunker fuel provided.

[72] 199 F.3d 220 (5th Cir. 1999).

[73] FOB ("Free on Board") is an Incoterm employed in maritime-transportation contracts that imposes upon the Seller the obligation to pay for all transportation and delivery charges relating to the goods until they are loaded aboard the Buyer's vessel.  *See e.g., Miami Purchasing Serv. Corp. v. Comm'r of Internal Revenue*, 76 T.C. 818, 828 (1981) ("According to the Uniform Commercial Code, 'F.O.B. the place of shipment' means that the seller must 'bear the expense and risk of putting them [the goods] into the possession of the carrier.'").  The subcharterer in *Lake Charles Stevedores* essentially disclaimed any obligation with respect to stevedoring services by purchasing the rice FOB.

[74] 199 F.3d at 231.

[75] *Ken Lucky*, 869 F.2d at 477.

14

authority to lien the vessel, and then flowed through an intermediary middleman to the actual fuel supplier, just like this case.[76] The precise bunkers ordered by Clearlake for each vessel were delivered by NuStar. VENUS and HELLAS GLORY's facts fit squarely within *Ken Lucky* and warrant an identical result.

Secondly, *Lake Charles Stevedores* recognized two classes of cases relating to the enforcement of maritime liens: the general contractor-subcontractor line and the middle-man line.[77] *Lake Charles Stevedores* cited *Ken Lucky* as exemplifying the middle-man line of cases, *id.*, but *Lake Charles Stevedores* itself dealt with a general contractor-subcontractor relationship. *Lake Charles Stevedores* did not establish any criteria that an actual fuel supplier in the middle-man line of cases must satisfy to obtain a maritime lien or hold that *Ken Lucky* was wrongly decided. Rather, it distinguished the facts of *Ken Lucky* as follows:

> The [*Ken Lucky*] court found that the order originated from the subcharterer, who had authority to bind the vessel, and that, under the circumstances, Marine Fuel was entitled to a lien. With the exception of the master's acceptance of the necessaries, LCS can point to no similar circumstances here.[78]

*Lake Charles Stevedores* court characterized the case before it as follows:

> We view the facts of the instant case as more akin to those in which general contractors have been engaged to supply a service and have called upon other firms to assist them in meeting their contractual obligations.[79]

*Lake Charles Stevedores* dealt with the general-contractor line of cases, not the middle-man line and, for all practical purposes, stands as *dicta* on issues relating to the latter cases.

By contrast, the present facts are directly on all fours with *Ken Lucky*, and the *Lake Charles Stevedores* court's own distinction is thus equally applicable, but here in reverse. Just like *Ken*

---

[76] *Id.*; see also *Crescent City Marine, Inc. v. M.V. Nunki*, 20 F.3d 665, 667 (5th Cir. 1994) ("[I]n the 'agent/broker' or 'middle-man' cases there were as many as five layers between the owner of the vessel and the service provider, yet the service provider was still permitted a lien against the vessel.").

[77] 199 F.3d at 228-229.

[78] *Id.*

[79] *Id.*

*Lucky* – and unlike *Lake Charles Stevedores* – the present case does not involve a general contractor supplying a service; rather, it involves a bunker supplier providing a necessary product – marine fuel – to the Vessels.[80] That was the precise issue considered in *Ken Lucky*, and its finding that the actual supplier possessed a maritime lien should be followed here.

Thirdly, unlike *Lake Charles Stevedores*, VENUS GLORY and HELLAS GLORY's authorized officers signed each NuStar Delivery Note, acknowledging the vessel's "ultimate responsibility." The chief engineers' signing and stamping each Delivery Note by itself acknowledges and ratifies NuStar's liens on the Vessels.[81]

Finally, while NuStar disputes that this is a "subcontractor" case, the Fifth Circuit stated in *Lake Charles Stevedores* that courts have considered certain factors in determining whether a subcontractor possesses a maritime lien, including: 1) whether the general contractor could be expected to hire subcontractors; 2) whether the subcontractor was identified and accepted by the vessel's owner or charterer prior to performance; or 3) whether there was owner involvement in directing, testing, and/or inspecting the subcontractor's performance.[82]

---

[80] *Galehead, Inc. v. M/V ANGLIA*, 183 F.3d 1241 (11th Cir. 1999), is clearly distinguishable. There, Asmar was not the actual supplier; it was an intermediary who engaged a fuel supplier to supply the ship. The actual fuel supplier was fully paid in that case, however, so the issue of whether it possessed a maritime lien was not before the court.

[81] *See e.g., Atl. & Gulf Stevedores, Inc. v. M/V Grand Loyalty*, 608 F.2d 197, 202 (5th Cir. 1979) ("We do not believe, however, that the sequencing of events is sacrosanct to the securing of the protections of a lien in a case as is here presented. Prior authorization is not an essential to preserving a lien position. We are cited to no authority in support of this interpretation. We reject same. Whether a lien is available must be determined by a fair consideration of the totality of the circumstances. Certainly prior authorization would be most relevant and material. But we do not interpret the provisions above cited to require prior authorization. Authorization, actual or fairly presumed, given prior to or during rendition of services, or ratified subsequent to rendition will suffice"); *Jan C. Uiterwyk Co. v. MV Mare Arabico*, 459 F. Supp. 1325, 1331 (D. Md. 1978) (emphasis added) ("Whichever entity may have actually ordered the performance of services by plaintiffs, the services were furnished to the MARE ARABICO and the MARE AUSTRALE, they were accepted by the ships' masters, the vessels themselves benefitted from their performance and the ordering of the services was ratified by the ships' masters on behalf of the owner and by representatives of the charterer."); *see also Galehead, Inc. v. M/V GOODPAL*, No. C98-0148, 1999 WL 1488986, at *2 (W.D. Wash. Jan. 20, 1999) and, *Reinholm Crane & Rigging Co. v. M/V Ocean Crown*, 484 F. Supp. 935, 936 (W.D. Wash. 1979).

[82] *Lake Charles Stevedores*, 199 F.3d at 231. *Lake Charles Stevedores* also states: "In keeping with the notion that subcontractors may acquire liens where the vessel's owners retain control over their selection and/or performance, the Ninth and Second Circuits require that an entity with authority to bind the vessel direct that the general contractor hire a particular subcontractor in order for that subcontractor to be entitled to a lien." *Lakes Charles Stevedores*, 199 F.3d at 231. None of the cited cases involve a middle-man scenario.

16

Here, Clearlake: (1) knew before delivery that NuStar was scheduled to supply bunkers to the Vessels; (2) accepted NuStar as the physical supplier; (3) arranged for its local agent to coordinate the bunker delivery with NuStar and its agents; and (4) through each Vessel's chief engineer, inspected and confirmed the performance by NuStar, and acknowledged "the receiving vessel's liability for the cost" of the Fuel NuStar delivered. Therefore, even if the Court accepts the argument that NuStar is a "subcontractor" under the "general contractor" line of cases, NuStar meets the requirements when courts have found a subcontractor to possess a maritime lien.

## C.    Two recent OW-related District Court opinions should not be applied by this Court to deny NuStar's maritime lien claim.

NuStar respectfully submits that two recent district-court decisions (one from the Eastern District of Louisiana and the other from the Southern District of New York), which ING Bank will undoubtedly rely on to support its "contract supplier has the maritime lien to the exclusion of the fuel supplier" argument, have misapplied certain principles of *Lake Charles Stevedores.* Specifically, these decisions incorrectly conclude that an actual fuel supplier does not possess a maritime lien, unless it was selected by the owner or its authorized representative, or an agency relationship existed between the intermediary and vessel interests.

In *Valero Marketing and Supply Co. v. M/V ALMI SUN*, Judge Brown held that a Corpus Christi fuel supplier (Valero) did not have a maritime lien after providing fuel to a vessel where OW served as a middle man on the deal.[83] The Court misconstrued the factual scenario presented as a *Lake Charles Stevedores* "general contractor-subcontractor" case when in fact it was a *Ken Lucky* situation as outlined above. Also, Judge Brown ignored the "identify and accept" language in *Lake Charles Stevedores* and the fact that the vessel interests ratified the deal by having their

---

[83] See *Valero Marketing and Supply Co. vs. M/V ALMI SUN,* USDC-EDLA Civ. Act. No. 14-2712 (Brown, J), Dkts. 38 and 49. Of note, plaintiff Valero (the actual fuel supplier) has filed an appeal of that decision to the Fifth Circuit. As of the date of NuStar's Summary Judgment motion herein, Valero's appeal remains pending.

representative (the vessel's chief engineer) sign the bunker-delivery receipts. In *Valero*, the vessel owner's corporate representative testified that he asked for the fuel supplier's identity when he was negotiating the price with the intermediary and did not object to it being Valero.[84] Thus, he identified and accepted Valero as the supplier prior to delivery. Judge Brown ignored this testimony and instead required the vessel owner to select the fuel supplier at the time of ordering for the actual supplier to possess a maritime lien. *Lake Charles Stevedores* imposes no such requirement, and instead said: "[i]n other cases in which subcontractors have been found to be entitled to a lien, those subcontractors were identified and accepted by the vessel's owner or charterer prior to performance."[85] That is precisely what happened in *Valero*.

Judge Brown also failed to account for the congressional intent behind CIMLA to protect American materialman, who provide necessaries to a foreign vessel in an American port. See discussion below. The net effect of Judge Brown's order would be to deny a maritime lien to every bunker supplier in the United States who is not in "privity of contract" with the owner or charterer, effectively eviscerating the protections CIMLA affords an American materialman.

In the second case, *O'Rourke Marine Services L.P., L.L.P. v. M/V COSCO HAIFA, et al.*,[86] Judge Sheindlin's analysis and interpretation of *Ken Lucky* is (with all due respect) simply wrong. In her *Opinion and Order*,[87] she wrote:

> In the middleman line of cases, courts hold that physical suppliers in a line of agency relationships can assert a lien against vessels, even though there are numerous intermediaries between supplier and vessel.
>
> In order for a physical supplier in O'Rourke's position to demonstrate that it provided necessaries to a vessel on the order of a person authorized by the owner, it must demonstrate that the intermediary entities that procured the necessaries – in

---

[84] *See* Pacer, Eastern District of Louisiana, C.A. No. 2:14-cv-02712-NJB-KWR, Doc. 41.1, p. 26, ll. 8-23.
[85] 199 F.3d at 231.  (Underlining added).
[86] *See* Pacer, Southern District of New York, C.A. No. 15-2992 (Scheindlin, J), Dkt. 79. Of note, plaintiff O'Rourke (the fuel supplier), has filed an appeal of that decision to the Second Circuit. As of the date of NuStar's Summary Judgment motion herein, O'Rourke's appeal remains pending.
[87] *See* Dkt. No. 79.

18

this case, O.W. Far East and OW USA – were in an agency relationship with the vessel or owner of the vessel in question. If such an agency relationship exists, and if the intermediary parties are therefore authorized to bind  the vessels to contracts, then the *Marine Fuel Supply* line of cases controls (and  O'Rourke prevails).  If no such agency relationship exists, then the *Lake Charles* line of cases controls (and O'Rourke loses).

However, quite to the contrary, *Ken Lucky* did **not** require proof of agency between the intermediary and the sub-charterer for the actual supplier to possess a maritime lien.[88]

Moreover, it does not logically follow that if an agency relationship is absent, a middle-man case suddenly becomes a general-contractor case governed by *Lake Charles Stevedores*. Judge Sheindlin improperly injected an "agency requirement" into *Ken Lucky* where one does not exist, and misapplied general–contractor requirements to a middle-man case.

### 3.   Public Policy Strongly Favors Awarding an American Materialman a Maritime Lien for Necessaries Supplied to a Foreign-Flag Vessel in an American Port

CIMLA was designed to protect American materialmen like NuStar, who supply necessaries to foreign-flag vessels in American ports.  In *Tramp Oil and Marine, Ltd. v. M/V Mermaid I,* the First Circuit held:

> The primary concern of the Federal Maritime Lien Act is the protection of American suppliers of goods and services.  See H. Rep. No. 92-340, 92[nd] Cong., 1[st] Sess., reprinted in 1971 U.S. Code Cong. & Ad. News 1363-65; *Gulf Trading & Transportation Co. v. The Vessel Hoegh Shield*, 658 F.2d 363, 367 (5th Cir. 1981), *cert. denied*, 457 U.S. 1119, 102 S.Ct. 2932, 73 L.Ed.2d 1332 (1982)("The congressional intent is that an American supplier of goods, services or necessaries to a foreign vessel obtains a maritime lien in the vessel when the goods or services are supplied or performed in the United States.").[89]

In *Hoegh Shield*, the Fifth Circuit said:

> It is not disputed that the bunkers were furnished by Gulf to the vessel within the jurisdiction of the United States and under shelter of United States law.  This Court has recognized that

---

[88] *See Ken Lucky*, 869 F.2d at 477.
[89] 805 F.2d 42, 46 (1st Cir. 1986).


(it) was the intent of the Congress to make it easier and more certain for stevedores and others to protect their interests by making maritime liens available where traditional services are routinely rendered....Speaking to the desired aim of the 1971 amendments (which deleted the clause which had allowed "no lien" provisions in charter contracts), the House Report concludes:

Granting the materialman a lien encourages the prompt furnishing of necessaries to vessels so that they can be speedily turned around and put to sea. This is especially significant today when the emphasis on vessel performance is reduced port time and increased speed.

*Atlantic & Gulf Stevedores, Inc. v. M/V Grand Loyalty*, 608 F.2d 197, 201 (1979) (citations omitted). . . .[90]

In *Gulf Trading & Transp. Co. v. M/V Tento*, the Ninth Circuit wrote:

When it amended the maritime lien provisions of the Ship Mortgage Act, 46 U.S.C. ch. 25, §§ 911-84 (1976), Congress demonstrated its intent that maritime liens be enforced even if it was the charterer rather than the owner who ordered the supplies giving rise to it. [citation omitted]. Before the amendment had been passed, it appeared that a prohibition of lien clause in a charter party barred the supplier from acquiring a lien on a vessel for necessaries furnished to it. The statute then in effect permitted a supplier to acquire such a lien despite a prohibition of lien clause in the charter agreement. Faced with a situation similar to the one before this court, Congress determined that the vessel, and not the American supplier, should bear the burden when a charterer has not paid for its supplies. The legislative history stated:

Your Committee gave careful consideration to this problem of American materialman where the owner, by chartering or surrendering possession of the vessel, clothes the master thereof with at least apparent authority to bind the vessel for necessaries furnished to the vessel. The question presented was where a loss occurs in this situation, whether it should be suffered by the owner of the vessel, or the American materialman who furnishes such necessaries in good faith.

After careful consideration of the entire record, your Committee has concluded that, as a matter of equity, the owner should bear the loss in such a situation.

As a practical matter, the owner can more easily protect himself contractually by bonds or otherwise at the time he charters the vessel, than can the American materialman who furnishes necessaries to a vessel under great economic pressure to put back to sea.

---

[90] 658 F.2d at 367.

20

H.R. Rep. No; 92-340, 92nd Cong., 1st Sess. 1, 3, reprinted in [1971] U.S. Code Cong. & Ad. News 1363, 1365.[91]

With such bedrock principles in mind, NuStar supplied bunker fuel to myriad foreign vessels in Texas through its dealings with OW. Denying an American fuel supplier a maritime lien financially harms that supplier and creates a disincentive for it to supply goods on credit to foreign ships in the future. That disincentive further harms maritime commerce by (1) limiting the number of necessaries suppliers that will provide such goods on credit, which in turns drives up the cost of such goods, (2) leading to pre-payment requirements, which drives up transactional costs and slows the pace of maritime commerce, and (3) ultimately reducing the number of American suppliers of necessaries. All the foregoing outcomes are completely contrary to CIMLA's goal of protecting American materialman and promoting U.S. maritime commerce.

In short, CIMLA was designed to protect American materialmen like NuStar, and nothing in the statute requires "privity" between the owner and the ultimate downstream supplier. Moreover, the nature of international maritime commerce makes privity between distant owners or charterers and American materialmen a practical impossibility; intervening intermediaries like OW protect their market turf by shielding their customers from such direct contact. Upholding a nonexistent requirement that a vessel owner must "select" the fuel supplier or that an "agency relationship" exist before allowing such supplier a maritime lien against the vessel will profoundly affect maritime commerce in the United States to the marked detriment of American materialman.

**4.     Equity and Good Conscience Support an Award in NuStar's Favor**

---

[91] 694 F.2d 1191, 1194 (9th Cir. 1982).

141535.06502/102259050v.1

There is no question that this Court, sitting in admiralty, possesses equitable powers and can "award what is fair to avoid injustice."[92] Here, equity and fairness are not served by allowing foreign vessels to receive and consume a **36,346** metric tons of bunker fuel at an approximate cost of $18 million – all at the expense of NuStar, the innocent American materialman.

NuStar's invoices total $1,208,032.76 for the Fuel NuStar supplied to the Vessels.[93] OW Switzerland's invoices total $1,308,597.10 for the same Fuel NuStar delivered.[94] Had OW Switzerland paid NuStar for the Fuel, OW Switzerland would have earned $100,564.40 (a 7.68% margin).[95] Instead, ING demands the whole amount invoiced by OW Switzerland without paying NuStar for its share.[96] Allowing ING Bank to recover $1,308,597.10 when OW Switzerland only ever expected to receive 7.68% of the proceeds amounts to an astronomical windfall of **1,101%!** Such a windfall is by any standard inequitable and unconscionable.[97]

ING Bank, despite being a creditor of the OW entities, has created a financial construct whereby any monies paid to it will not flow into any bankruptcy proceedings. It seeks to recover by way of assignment under the Security Agreement, discussed below, and in the process by-pass any insolvency proceeding. ING's strategy was made clear in an OW case that recently went to trial in the Northern District of Florida. In its post-trial brief, ING wrote:

> Moreover, ING and O.W. Middle East have entered into a cooperation agreement with respect to any receivables due to O.W. Middle East. *See* Trial Tr. at 170:10-172:2 (Copley). If ING collects on O.W. Middle East's invoice to Boldini, it will

---

[92] *See e.g., Great Lakes Business Trust v. M/T Orange Sun*, 855 F. Supp. 2d 131, 146 (S.D.N.Y. 2012); *see also Vaughn v. Atkinson*, 369 U.S. 527, 530 (1962) ("Equity is no stranger in admiralty; admiralty courts are, indeed, authorized to grant equitable relief."); *Custom Fuel Services, Inc. v. Lombas Industries, Inc.*, 805 F. 2d 561 (5th Cir. 1986) ("The power of an admiralty court to scrutinize the underlying validity of liens and mortgage claims is of ancient origin and derives from the court's historic equity jurisdiction.").

[93] *See* NuStar SOF 18, citing to Belknap Exs. 21-22, NuStar invoices.

[94] *See* NuStar SOF 25, citing to Belknap Ex. 28, OW Switzerland invoices.

[95] *See* NuStar SOF 26, citing to Belknap Ex. 29, Exhibit 13 (Margin Table) to Deposition of ING Bank FRCP 30(b)(6) Representative Paul Copley.

[96] *See* NuStar SOF 27, citing to Dkt. No. 125, ING Ans., counterclaim and crossclaim at ¶¶ 9-13.

[97] NuStar has asserted a claim for unjust enrichment against ING under principles of equity. See footnote 35 above.

22

> maintain that cash until ING and O.W. Middle East have agreed (or a court decides)
> whether the receivables have been validly assigned to ING. *Id.* If such assignment
> is agreed or deemed to be valid, ING will distribute the cash to the lender syndicate.
> *Id.* ....[98]

NuStar does not seek monies belonging to any O.W. entity. NuStar's lien claims have always been asserted against the vessels, which have never been part of any bankruptcy estate.

Lastly, while some cases have alluded to their being only one maritime lien for the provision of necessaries to a vessel, there appears no justification as to why such a rule should govern. For example, general contractors and their sub-contractors often assert materialman's liens for their work on the same onshore construction project. A fair allocation of the monies at issue in this case would allow each party to recover their expectancy interest for the losses each suffered: $1,208,032.76 to NuStar; and $100,564.34 to ING. ING suffered no loss that warrants recovering 1,101% more than OW Switzerland ever expected to receive. NuStar respectfully submits that equitable principles in this admiralty proceeding fully justify exercising this Court's discretion to fashion a remedy that compensates NuStar for the Fuel it provided to the Vessels.

## 5.   ING Bank's Security Agreement Does Not Afford it a Maritime Lien

ING Bank does not possess a maritime lien against the Vessels. ING Bank does not meet the requirements of CIMLA in its own right; it neither contracted for nor supplied any bunkers. Consequently, ING Bank could only assert such a lien by way of assignment or subrogation. Because it has paid no claims of parties claiming maritime-lien rights, it possesses no equitable subrogation rights, which leaves us with determining whether ING Bank received an assignment of maritime lien rights from OW via their "Security Agreement."

---

[98] *See* Pacer, North District of Florida, C.A. No. 5:14-cv-00322-RH-GRJ, Doc. 116, p. 7 n.2.

23

"Maritime liens are *stricti juris* and cannot be created by agreement between the parties; instead, they arise by operation of law, often depending on the nature and object of the contract."[99]

ING Bank's Security Agreement defines "Supply Receivables" as follows:

**Supply Receivables** means any amount owing, or to be owed, to a Receivables Chargor or a Danish Receivables Chargor under any Supply Contract.[100]

The Security Agreement then defines "Supply Contract" as follows:

**Supply Contract** means any one-time contract, any contract used as a framework agreement (howsoever described) or the overarching general terms and conditions of the Group, in each case governed by English law and relating to the sale of oil products traded by the Group, as governs:

(a)     *the contractual relationship between the relevant debtor and a Receivables Chargor at any time;*

(b)     *the contractual relationship between the relevant debtor and a Danish Receivables Chargor as at the date of this Deed,*

and shall in each case included any invoice issued thereunder (excluding in each case any such agreement between a Danish Receivables Chargor and DFDS A/S and any invoice issued thereunder). (Italics added). [101]

ING Bank relies upon the Security Agreement's definition of Supply Receivables as the basis for its assignment rights. That term is premised upon amounts owing or to be owed "*under any Supply Contract.*" The Security Agreement could have said, but did not, that any *maritime liens* accruing in OW's favor were assigned to ING Bank. Neither the Security Agreement nor any language in any of ING Bank's Finance Documents mentions or assigns "maritime liens."

Because no "Supply Contract" gives rise to a maritime lien, it follows logically that any

---

[99] *See Triton Marine Fuels Ltd., S.A. v. M/V PACIFIC CHUKOTKA*, 575 F.3d 409 (4th Circ. 2009). Choice of law clauses in a contract do not create maritime liens. *Id.* at 416; *see also Vestoil, Ltd. v. M/V M PIONEER*, No. 6:04CV770-ORL-19DAB, 2005 WL 3675960 (M.D. Fla. Mar. 31, 2005).

[100] See Belknap Ex. 30, Declaration of Paul Copley with English Omnibus Security Agreement, previously filed in Civil Action 4:14-cv-03686, NuStar Energy Services, Inc. v. M/V ELKA ANGELIQUE, et al., pending in the U.S. District Court for the Southern District of Texas, Houston Division, at p. 5 of Omnibus Security Agreement.

[101] *Id.*

24

amount due and owing under a maritime lien also does not arise "under any Supply Contract." Instead, a maritime lien for necessaries is independent of contract and arises *in rem* against the recipient vessel, a separate juridical entity, upon the supply of necessaries to the vessel.[102] Moreover, a "Supply Contract" as defined in ING Bank's Security Agreement is governed by English law, which does not recognize a maritime lien for necessaries.[103] The accompanying opinion of English barrister Peter MacDonald Eggers supports the proposition that the Security Agreement does not assign maritime liens under English law.[104]

It follows from the foregoing that all of ING's right, title and interest in the Supply Receivables does *not* include any O.W. entity's maritime liens rights.  Concomitantly, ING Bank does not possess maritime liens against the Vessels by virtue of ING Bank's Security Agreement.

## CONCLUSION

NuStar respectfully requests that this Court grant its motion for summary judgment affording it maritime liens against the Vessels, award its claimed damages and interest, and for all such other and further relief, which may be just and proper.

Dated: May 13, 2016
New York, New York

BLANK ROME LLP

 */s/ Thomas H. Belknap, Jr.*
Thomas H. Belknap, Jr.
The Chrysler Building
400 Lexington Avenue
New York, New York 10174-0208
tbelknap@blankrome.com

---

[102] *See e.g., Trinidad Foundry and Fabricating, Ltd. v. M/V K.A.S. Camilla,* 966 F.2d 613 (11th Cir. 1992).
[103] *Id.* at 616.
[104] See Belknap Ex. 31, February 24, 2016, English Legal Opinion of Peter John Sibley MacDonald Eggers, QC.

25

Keith B. Letourneau
717 Texas Avenue, Suite 1400
Houston, TX 77002
kletourneau@blankrome.com

*Counsel for Defendant*
NUSTAR ENERGY SERVICES,
INC.

26